No. 81–99. KOLOM ET UX. *v.* COMMISSIONER OF INTERNAL REVENUE. C. A. 9th Cir. Certiorari denied. ▪

JUSTICE POWELL, dissenting.

In the decision below, "fair market value" of a share of stock for minimum-tax purposes was determined solely by reference to the New York Stock Exchange (NYSE) price at the time of purchase even though § 16(b) of the Securities Exchange Act of 1934, 48 Stat. 896, 15 U. S. C. § 78p(b), effectively prohibited the taxpayer's sale of the security for six months thereafter. The case presents an important question of fairness to taxpayers, who, under this ruling, must recognize a "gain" that does not yet exist and may never materialize. Because the decision below is not supported by either the statutory language or its legislative history and because it tends to frustrate the congressional policy favoring employee stock ownership, I would grant certiorari and set the case for argument.

I

In 1968, 1970, and 1971, petitioner Aaron L. Kolom received options to acquire stock in Tool Research and Engineering Corp. (TRE) pursuant to a plan that qualified under § 421 and § 422 of the Internal Revenue Code of 1954 (IRC), as amended, 26 U. S. C. § 421 and § 422. Kolom exercised the options in September and October 1972 when he was an officer and director of TRE. He bought a total of 12,427 shares in three blocks at an average of 13¼, 12, and 19⅝, per share. On the dates of exercise, the mean prices of the stock on the NYSE were, respectively, 52, 45¼, and 45¼.

Because Kolom was a TRE director, he was not free to take this "gain." Under § 16(b) of the Securities Exchange Act, 15 U. S. C. § 78p(b), Kolom would have been liable to the company for any profits realized from the sale of these shares during the 6-month period following exercise of his op-

tion.  And by the time Kolom was able to sell, the situation had altered dramatically.  Six months after the date of exercise of the first block, the NYSE price dropped over 50% to 23⅜.  Six months after the date of exercise of the other two blocks, the NYSE price also dropped over 50% to 20⅞.  Kolom eventually sold 5,000 of the shares for an average price of $9.27 per share, realizing a substantial loss on the transaction.

Under the IRC provisions in effect at that time, the exercise of the options did not result in any recognized compensation for purposes of calculating income because the TRE Employee Stock Option Plan (Plan) qualified under § 421 and § 422.  Tax on stock transferred under a qualified plan is deferred until the stock is sold, and any gain is then taxed at capital-gains rates provided certain other requirements are met.

Stock received pursuant to a qualified plan can, however, result in tax liability under the minimum-tax provisions. Title 26 U. S. C. § 56 and § 57 (1976 ed. and Supp. III) impose a tax on certain "preference" items, including stock received under plans that qualify under § 421 and § 422.   The Commissioner audited Kolom's 1972 return and assessed a deficiency on the ground that, for purposes of calculating his minimum tax, Kolom should have included as a "preference" item the difference between the option price and the NYSE price at the time each option was exercised.   The Commissioner argued that Kolom should have included his "gain" of $424,888 as a preference item even though Kolom could not have realized the gain and even though the gain evaporated in the course of the six months following exercise of the option. This fictional gain resulted in a deficiency assessment of $43,792.   The Tax Court affirmed the Commissioner, as did the Court of Appeals for the Ninth Circuit.

## II

"As is true in every case involving the construction of a statute, our starting point must be the language employed by

Congress." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979). See also *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 756 (1975) (POWELL, J. concurring). For purposes of calculating the minimum tax, "tax preference items" include stock transferred pursuant to a qualified plan to the extent "*the fair market value* of the share at the time of exercise exceeds the option price." IRC §57(a)(6) (emphasis added). Thus, under the express terms of the statute, the amount included as a "preference" item is only the difference between the fair market value at the time the option is exercised and the option price.

As this Court noted in *United States* v. *Cartwright*, 411 U. S. 546, 551 (1973), "[t]he willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves." The *Cartwright* Court described fair market value as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" *Ibid.* (quoting Treas. Reg. §20.2031–1(b)).

At the time he exercised his option, Kolom would not have sold willingly at the NYSE price. Indeed, he would not have sold willingly at *any* price above the option price on that date or any date during the next six months because he then would have been obligated to pay to the corporation the entire amount of the "gain." In the past, this Court has taken into account such constraints in determining fair market value. In *Helvering* v. *Tex-Penn Co.*, 300 U. S. 481 (1937), the taxpayers, pursuant to the terms of a corporate reorganization, received stock that was restricted against sale for a period of up to six months. The Court held that "the shares of . . . stock, regard being had . . . to the terms of a restrictive agreement making a sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers." *Id.*, at 499. See also *MacDonald* v. *Commis-*

*sioner*, 230 F. 2d 534, 539–541 (CA7 1956) (applying *Tex-Penn* in finding no recognizable gain in purchase by corporate insider liable under § 16(b)).

## III

The basis for the Commissioner's unrealistic interpretation of "fair market value" in the case at bar is Treas. Reg. § 1.57–1(f)(3), which states:

"In accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be determined without regard to restrictions (other than nonlapse restrictions within the meaning of § 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised." 26 CFR § 1.57–1(f)(3) (1980).

But by applying the "principles of section 83(a)(1)" to the valuation of qualified stock under § 57(a)(6), this Treasury Regulation ignores basic differences in the language and purposes of the two sections. Most significantly § 57 is directed to the capture, for minimum-tax purposes, only of stock acquired pursuant to *qualified* plans under § 421 and § 422. By contrast, § 83 is directed solely at the taxation of those options that are *not* acquired as part of such plans. IRC § 83(e) states explicitly that the income tax imposed on restricted stock by § 83 does not apply to stock transferred under qualified plans. Thus, the Commissioner has applied the § 83(a) valuation technique to a transfer of *qualified* stock even though Congress has stated that § 83 is of no relevance to transfers of that type.

A brief glance at the legislative history explains the policy basis for the difference in treatment of stock issued under qualified plans and stock issued under plans that do not qualify. As the Joint Committee on Internal Revenue Taxation

explained, § 83 was enacted to impose income tax on so-called "restricted stock plans" which were used to defer compensation actually owed employees. See Joint Committee on Internal Revenue Taxation, General Explanation of the Tax Reform Act of 1969, H. R. 13270, 91st Cong., Pub. L. 91–172, pp. 109–111 (Comm. Print 1970). Under some deferred-compensation plans involving stock, an employee could postpone his tax liability even though he had effective control over the stock with little or no risk of forfeiture. To capture the gain effectively realized under such plans, Congress enacted § 83(a), which provides that stock purchased by an employee is income to the extent its fair market value exceeds purchase price, without regard to restrictions that lapse. *Ibid.* In short, Congress enacted § 83 for the purpose of ending tax avoidance schemes using spurious restrictions.

Congress did not, however, intend to tax, as compensation in the year received, *all* stock transferred to employees because such treatment would defeat another congressionally favored policy: long-term employee ownership of company stock. It is this policy that justifies the favored treatment accorded qualified stock option plans. Employees are less likely to buy *and hold* stock if they must realize a theoretical gain in the year of purchase even though in fact they receive no cash with which to pay the tax. Congress therefore provided that transfers pursuant to plans that qualify under § 421 and § 422—plans that give employees a "stake" in the business rather than simply deferring compensation—are exempt from the income tax imposed by § 83(a). See, *e. g.,* H. R. Rep. No. 91–413, pt. 1, p. 87 (1969).[1]

---

[1] Transfers of stock under plans that qualify under § 421 and § 422 are, *by definition*, a legitimate transfer of a "stake" in the employer to the employee. In order to qualify under § 422(b), the option must have a maximum term of five years and the option price cannot be less than the market price of unrestricted stock at the time the employee receives the option. In addition, in order to defer tax recognition under § 421, the employee

It is this policy of encouraging employee stock ownership that explains why the language of § 57 and § 83 differs. Both sections were enacted as part of the Tax Reform Act of 1969. Yet § 57, imposing minimum tax on the transfer of qualified stock, uses *only* the words "fair market value," whereas § 83, seeking to end tax avoidance through the use of *non*-qualifying stock and spurious restrictions, modifies that phrase with a parenthetical indicating that restrictions that lapse are to be ignored. Congress' failure to include any similar qualification in § 57 strongly suggests that it intended to use "fair market value" in its traditional and well-established sense. Any other understanding of the term would defeat the purpose §§ 57, 421, and 422 were designed to serve.

Kolom received his options under a plan that qualified under § 422(b). Because his transactions met the requirements of that section, the stock represented "a stake in the business," and Kolom was entitled to defer recognition under § 83(e). Only a rash speculator would have exercised those options to obtain the "stake" in the corporate employer encouraged by § 421 and § 422 with the knowledge that he thereby could be liable for a substantial tax under the minimum-tax provisions on a gain that, by law, he could not realize. The decision below, imposing tax under such circumstances, is inconsistent with the congressional policy of encouraging long-term employee ownership of company stock and with the plain language of the statute.[2]

---

cannot sell qualifying stock for a period of at least three years after the grant of the option and must still be an employee within three months of the exercise of the option. Thus, any difference between the option price and the NYSE price at the time the option is exercised represents the employee's "stake" in his corporate employer during the term of his employment *after* the receipt of the option rather than an attempt to avoid taxes by attaching ephemeral restrictions to stock transferred to the employee at less than its market value at the time of the transfer.

[2] Petitioner husband argues that the Commissioner's action deprived him of property without due process of law. Because I would decide the case on statutory grounds, I would not reach this issue.

The present interpretation of these provisions by the IRC also results in a degree of unfairness that hardly could have been intended by Congress. The case merits plenary consideration by the Court.