LOUIS B. GRESHAM AND MARGARET S. GRESHAM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14686–79. Filed August 16, 1982.

---

[9]7% × $20,460 = $1,432.20.

[11]See also Rev. Rul. 75–302, 1975–2 C.B. 87.

*Stanley P. Weiner*, for the petitioners.
*Alan M. Jacobson*, for the respondent.

WHITAKER, *Judge*: Respondent determined deficiencies in petitioners' income taxes as follows:

| Year[1] | Deficiency |
|---|---|
| 1975 | $13,234.59 |
| 1976 | 17,916.67 |

The sole issue for decision is the fair market value for purposes of the minimum tax, section 57(a)(6),[2] of shares of stock acquired by petitioner Louis B. Gresham pursuant to several exercises of a qualified stock option.

### FINDINGS OF FACT

The facts are fully stipulated and are found accordingly.

Louis B. Gresham (petitioner) and Margaret S. Gresham are husband and wife. They filed joint Federal income tax returns for the years 1975 and 1976. Mrs. Gresham is a petitioner only by reason of having filed joint income tax returns with her husband. At the time the petition was filed, petitioners resided in Shawnee Mission, Kans.

During the years in question, petitioner was chief executive officer of General Energy Corp. (GEC). GEC common stock was then traded on the over-the-counter market. Effective January 1, 1973, GEC adopted a stock option plan meeting the requirements of section 422. Pursuant thereto, petitioner received a stock option for 50,000 shares of stock. The option price was $2.50 per share. As a condition to the issuance of stock pursuant to the exercise of the option, petitioner was required to execute an "investment letter" in order for the transaction to be exempt from the registration requirements of the Securities Act of 1933, as amended, 15 U.S.C. sec. 77d(2).

In general, under the rulings of the Securities and Exchange

---

[1]The year 1974 is also involved. See note 8 below.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended.

Commission (SEC), the effect of the required investment letter was to prohibit petitioner for a period of 2 years from selling the shares except in a private placement, unless a registration statement was in effect with respect to the shares. No such registration statement was in effect on the dates of issuance of the option shares. In any such private placement, the SEC would require the purchaser to execute a similar investment letter. Certificates for the option stock were required to bear an appropriate legend, and a stop transfer order was placed against the share with GEC's transfer agent.

Petitioner exercised the option to the extent of 5,000 shares in December 1974. During 1975, petitioner purchased in two separate exercises a total of 25,000 shares, and in 1976, petitioner purchased the remaining 20,000 shares of stock. Upon each exercise of the option, petitioner executed the required investment letter.

For purposes of the minimum tax calculation on petitioner's 1974,[3] 1975, and the 1976 returns, petitioner determined the bid prices for the GEC common stock traded on the over-the-counter market on the dates of exercise of the option and then discounted the total value of each block of shares purchased by $33\frac{1}{3}$ percent, reporting the discounted value as the fair market value of the option stock so acquired. The amount of tax preference income in each year was determined by deducting from the discounted value of the option stock petitioner's cost for the stock.[4]

In determining the deficiencies for these 2 years, respondent valued the option stock at the mean of the bid and asked prices in the over-the-counter market on the dates of exercise of the option, without taking into account the effect of the investment letter restrictions applicable to the stock. In so doing, respondent applied section 1.57–1(f)(3), Income Tax Regs.,[5] which adopts the principles of section 83(a)(1) to compute fair

---

[3]Petitioner paid no minimum tax for 1974 as a result of the carryovers allowed by sec. 56(c), as then in effect.

[4]Inadvertently, in determining the value for this purpose of the option stock acquired in 1976, the discount was applied twice.

[5]Sec. 1.57–1(f)(3), Income Tax Regs., provides:

(3) *Fair market value.* In accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be determined without regard to restrictions (other than nonlapse restrictions

market value for purposes of the minimum tax. Section 83(a)(1) specifies that restrictions shall not be taken into account in valuing stock unless they are nonlapse restrictions. The restrictions in this case, which are required under the Securities Act of 1933, as amended, and the rules of the SEC, are considered to be ones which will lapse. See sec. 1.83–3(h), Income Tax Regs.

In this case, the parties have stipulated that if the Court holds that section 1.57–1(f)(3), Income Tax Regs., is valid and applicable, petitioner will concede the deficiencies as asserted in the statutory notice, including the increased deficiency for 1975 asserted in respondent's amendment to the answer. On the other hand, the parties have stipulated that if we should decide that the regulation is not valid or does not apply, the fair market value of the stock is to be determined by applying a discount of 33⅓ percent to the mean of the bid and asked prices on the over-the-counter market.[6] Application of this discount will reflect the price at which the shares could have been sold in a private placement with the purchaser executing a similar investment letter.

Pursuant to the stipulation, we find that the mean of the bid and asked prices in the ̄ over-the-counter market of GEC common stock on the several dates on which petitioner exercised the option in 1974, 1975, and 1976 were as follows:[7]

| Date | Mean price |
|---|---|
| Dec. 11, 1974 | $10.9375 |
| Feb. 10, 1975 | 15.3125 |
| July 28, 1975 | 13.6875 |
| Feb. 5, 1976 | 10.750 |

We find that on the respective dates of the transfer of stock to petitioners upon the exercise of this option, the only method by which petitioners could have sold the stock was through a

within the meaning of § 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised.

[6]The parties are also in agreement that an adjustment would have to be made in that case to take into account the use by petitioner of a double discount for the year 1976. Other adjustments to the deficiencies will follow automatically from the Court's decision.

[7]In computing the minimum tax for 1975, respondent reduced the tax carryover from 1974 as a result of revaluing the option stock acquired in 1974 at the mean of the over-the-counter market rather than at the discounted value used by petitioner.

private placement at a price equivalent to 66⅔ percent of the mean of the bid and asked prices in the over-the-counter market on those dates. We further find that the fair market value of the option stock on the respective dates of acquisition was such discounted value.

## OPINION

Section 56 imposes a minimum tax upon the sum of the items of tax preferences with adjustments not here material. The tax preferences are listed in section 57. Of these, only section 57(a)(6), reading as follows, is applicable here:

(6) STOCK OPTIONS.—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the *fair market value* of the share at the time of exercise exceeds the option price. [Emphasis supplied.]

The stock in question was transferred to petitioner upon the exercise of his qualified stock option; thus, we are called upon to determine the amount of this tax preference, that is, the amount, if any, by which the fair market value of the shares exceeded the option price on each date. There is no dispute as to the option price so our inquiry is simply as to the "fair market value" of the shares on each date.

The Code does not define the term "fair market value." However, for many years the universally accepted definition of this term has been the willing buyer, willing seller test under which fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright,* 411 U.S. 546, 551 (1973). Normally, the fair market value of shares of stock which are listed or traded on a stock exchange or the over-the-counter market is the mean between the highest and lowest quoted selling prices on the day in question, but there are many exceptions to this rule, such as when there is a restriction on the sale of the stock. *Kolom v. Commissioner,* 71 T.C. 235 (1978), affd. 644 F.2d 1282

(9th Cir. 1981); *Frizzelle Farms, Inc. v. Commissioner*, 61 T.C. 737 (1974).[8] On the dates in question, there was an over-the-counter market for GEC shares which would fix the fair market value of shares which would or could trade in that market. It is respondent's position that this over-the-counter fair market value should be used for the stock in issue here, but respondent ignores the fact, which we have found in this case, that there were significant restrictions on the sale of the shares of the option stock, as reflected by the investment letters. These restrictions precluded trading these shares of stock on the issue dates on the over-the-counter market; thus, that market cannot establish fair market value.

On the authority of section 1.57-1(f)(3), Income Tax Regs., respondent urges that we ignore the restrictions and accept the artificial concept of fair market value which is mandated by Congress in section 83(a),[9] but nowhere appears in sections 56 and 57. We disagree. For the reasons expressed herein, we hold that section 1.57-1(f)(3), Income Tax Regs., is inconsistent with the plain meaning of the statute.

This Court considered this regulation in *Kolom v. Commissioner, supra*, but in a slightly different context. There, we determined, for purposes of the minimum tax, the fair market value of option stock the disposition of which was subject to section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. sec. 78p(b). Section 16(b) requires that a corporate insider who sells his option stock upon the date of issuance, or at any time

---

[8]See also *United States v. Cartwright*, 411 U.S. 546 (1973); sec. 20.2031-2(b), Estate Tax Regs.

[9]Sec. 83(a) reads as follows:

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's-length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

within 6 months thereafter, for a profit (that is, for an amount in excess of his option price), must return that profit to the issuing corporation, his employer. Although we recognized that section 16(b) might affect the value of the stock to an insider such as the petitioner in *Kolom*, we held that this section does not affect the fair market value of the stock for purposes of sections 56 and 57(a)(6). Section 16(b) does not preclude sale in the particular market; it merely captures the insider profit if realized within 6 months.

Here, in contrast, the effect of the restriction was to make a private placement sale the *only* market for the stock on the dates in question. Moreover, because the purchaser of such stock was required to execute an investment letter restricting his ability to dispose of the stock, the restriction significantly reduced the value of the stock in that market. See *LeVant v. Commissioner*, 45 T.C. 185, 203–205 (1965), revd. and remanded 376 F.2d 434 (7th Cir. 1967). The parties have stipulated that the stock's fair market value in the private placement market was 66⅔ percent of the mean of the bid and asked prices on the over-the-counter market for stock not bearing this restriction. Thus, *Kolom* is factually distinguishable from this case.

In *Kolom*, we carefully avoided deciding on the validity of section 1.57–1(f)(3), Income Tax Regs., as applied to situations where the fair market value under the willing seller, willing buyer test was not the same as the fair market value which respondent determined by application of the regulations.[10] See 71 T.C. at 243. Here, by contrast, we find that application of the regulation does change the criteria for determining fair market value since fair market value under the regulation is the mean of the over-the-counter bid and asked prices for similar stock not subject to restrictions, while fair market value under the willing buyer, willing seller test is only 66⅔ percent of such amount.

Because neither *Kolom* nor any other case has addressed the

---

[10]*Hinton v. Commissioner*, T.C. Memo. 1982–221, is not to the contrary. There we again determined the fair market value of option stock held by an insider subject to sec. 16(b), Securities Exchange Act of 1934, 15 U.S.C. sec. 78p(b). In a brief reference to *Kolom v. Commissioner*, 71 T.C. 235 (1978), we summarized our treatment of the regulation in that case by stating that we upheld its validity, without intending in any way to change our clear reservation of the validity issue as expressed in *Kolom*.

overall validity of the regulation, we must now determine whether or not there is any reasonable basis upon which to ignore the apparently plain meaning of section 57(a)(6) and to apply, instead, the artificial criteria of section 83(a)(1) to the determination of fair market value as the regulation directs.

Respondent would have us treat section 83 and sections 56 and 57 in tandem, both reflecting congressional action in 1969 to close existing loopholes and to more equitably apportion the tax burden. However, the fact that both sections were added to the Code in 1969 and were designed to achieve somewhat comparable objectives does not necessarily imply that they must be construed alike. Comparison of these two provisions of the 1969 Act demonstrates that Congress intended different results in the two sections.[11] It is patently clear that Congress had before it the question of the effect of restrictions on sales of property received as compensation for services. In section 83, Congress unequivocally modified the concept of fair market value, whereas, in section 56(a)(6), the modifying language was omitted. We fail to find the necessary ambiguity to allow us to ignore statutory language. Accordingly, we hold that regulation 1.57–1(f)(3) is inconsistent with the statute and is therefore invalid.

Respondent points to language in *Kolom* in which we recognized (note 12) that Congress intended by section 56 to require payment of tax on "economic income." Respondent argues that in this case the difference between the stock's value on the over-the-counter market and petitioner's cost is economic income because were it not for the deferral of section 421, petitioner would have been required to pay tax on such difference. However, respondent loses sight of the fact that

---

[11]In his dissent to the denial of the writ of certiorari in *Kolom v. Commissioner*, 454 U.S. 1011 (1981), Justice Powell noted the dissimilarity in the language of these two 1969 Act provisions:

"It is this policy of encouraging employee stock ownership that explains why the language of §57 and §83 differs. Both sections were enacted as part of the Tax Reform Act of 1969. Yet §57, imposing minimum tax on the transfer of qualified stock, uses *only* the words 'fair market value' whereas §83, seeking to end tax avoidance through the use of *non*-qualifying stock and spurious restrictions, modifies that phrase with a parenthetical indicating that restrictions that lapse are to be ignored. Congress's failure to include any similar qualification in §57 strongly suggests that it intended to use 'fair market value' in its traditional and well-established sense. Any other understanding of the term would defeat the purpose §§57, 421 and 422 were designed to serve. [454 U.S. 1011, 1016 (1981), 81–2 USTC par. 9741, at 88,487.]"

these shares of stock could not have traded on the over-the-counter market irrespective of section 421. The option stock received by petitioner was not exactly like shares of GEC stock which he could have purchased on the open market. The option stock had a unique aspect, a limitation on marketability attached to the particular shares and plainly spelled out on the certificates. The willing buyer, willing seller here would be dealing in a property which had its own inherent peculiarities. The economic value of these shares of stock on the dates of issuance to the willing buyer as well as to the willing seller was that price at which these shares of stock could trade in the private placement market only.

Respondent calls to our attention the case of *Harrison v. United States*, 475 F. Supp. 408 (E.D. Pa. 1979), affd. per order 620 F.2d 288 (3d Cir. 1980), in which the U.S. District Court found this regulation to be reasonable and consistent with the legislative purpose. We respectfully disagree. That court noted that this regulation was initially proposed in December 1970 and remained in the same proposed form until adopted in 1978, and that during that period section 57 was amended by Congress on several occasions. The District Court interpreted this as tantamount to congressional approval of respondent's regulation. There is, however, no evidence that Congress ever focused on this particular regulation, which is not unusual since it remained in proposed form during that 8-year period. Until 1978, respondent's interpretation was uncertain.[12] This fact situation does not rise to the status of congressional adoption of a departmental construction. See, e.g., *Lykes v. United States*, 343 U.S. 118 (1952).[13]

The other court which has examined section 1.57–1(f)(3), Income Tax Regs., avoided the validity issue, as we did in *Kolom v. Commissioner, supra.* The U.S. District Court for the

---

[12]The preamble to T.D. 7564, 1978–2 C.B. 19, reflects that consideration was given to comments received on this part of the proposed regulation urging that restrictions should be taken into account.

[13]It is interesting to note that Congress has become aware of court decisions such as *Kolom v. Commissioner, supra,* and as a part of the Economic Recovery Tax Act of 1981, 95 Stat. 172, 260, has amended sec. 83(c) to provide that, with respect to the sec. 16(b) situation, the taxpayer's ownership of shares of stock would be deemed to be subject to a substantial risk of forfeiture and not transferable, hence not taxable, until after expiration of the 6-month period.

Northern District of Iowa in *Thomsen v. United States*, an unreported case (N.D. Iowa 1981, 47 AFTR 2d 81–93, 81–1 USTC par. 9253), held that the section 16(b) requirement does not affect market value.

We conclude that section 1.57–1(f)(3), Income Tax Regs., is contrary to the unambiguous language of section 57(a)(6). The section 57(a)(6) fair market value criterion requires that restrictions applicable to shares of option stock in the hands of both the willing seller and the willing buyer must be taken into account in determining fair market value. We hold for petitioner.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

FEATHERSTON, *J.*, concurring: I agree with the majority's conclusion. As I understand respondent's argument in support of the validity of section 1.57–1(f)(3), Income Tax Regs., the underlying premise is that Congress made a mistake in drafting Code section 57(a)(6). As applied to nonqualifying stock, Code section 83(a) expressly modifies the phrase "fair market value" by a parenthetical provision that such value shall be "determined without regard to any restriction other than a restriction which by its terms will never lapse." Code section 57(a)(6), which prescribes one of the tax preference items to which the minimum tax applies, contains no similar modification of the term "fair market value." This latter section has the effect of imposing the minimum tax on the amount by which "the fair market value" of the qualified stock "at the time of exercise exceeds the option price." The argument supporting the regulation assumes that Congress merely neglected to include in section 57(a)(6) the parenthetical provision which it inserted in section 83(a); to cure that oversight and carry out what respondent views as the congressional intent, the regulation was adopted to extend the section 83(a) valuation method to the minimum tax provisions.

The willing buyer, willing seller concept of "fair market value" is nearly as old as the income tax law itself. *United States v. Cartwright*, 411 U.S. 546, 551 (1973). Within this

ordinary meaning of the term, it is undisputed that the SEC restriction here reduced the public trading value of the stock received by petitioner. The majority opinion effectively makes the point that section 57(a)(6), without the section 83(a) parenthetical modification of the accepted definition of fair market value, is clear and unambiguous and that adding the parenthetical modification by regulation goes beyond the words of the section. Ordinarily, there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Ass'ns.*, 310 U.S. 534, 543 (1940); *Busse v. Commissioner*, 479 F.2d 1147, 1151 (7th Cir. 1973). Neither "the taxing authorities nor the courts are justified in virtually amending a taxing act because they are of the opinion that Congress may have had or should have had a different intention than that which was expressed in the act." *Helvering v. Rebsamen Motors, Inc.*, 128 F.2d 584, 588 (8th Cir. 1942). That reasoning is particularly forceful here because both section 57(a)(6) and section 83 were added to the Code by the Revenue Act of 1969 when the entire gamut of stock restriction problems was carefully examined.

I can find nothing written or spoken by the Congress in connection with the 1969 congressional examination of stock restrictions that refutes Justice Powell's statement in *Kolom v. Commissioner*, 454 U.S. 1011, 1016 (1981), 81–2 USTC par. 9741, at 88,487, quoted in note 11 of the majority opinion, that: "It is this policy of encouraging employee stock ownership that explains why the language of section 57 and section 83 differs." To effectuate this policy, section 83(e) provides that section 83 shall not apply to "a transaction to which section 421 applies." For income tax purposes, this means that the application of section 83 (and thus, the valuation method contained in section 83(a)) is prohibited where section 421 applies (as it does in the instant case). Yet, as explained by Justice Powell, without anything in the language of section 57(a)(6) or its legislative history to support it and in frustration of the underlying policy, the regulation applies the section 83(a) valuation method to the minimum tax provisions with respect to qualified stock.

I think it is important that section 56 by clear wording imposes a tax "In addition to the other taxes" imposed under

the income tax provisions. This additional tax, the minimum tax, is, in effect, a "flat tax" imposed on specified tax preference items without the ameliorating effects of most deductions, bases adjustments, or carryover and carryback deductions prescribed for the income tax. All the tax preference items except the one here involved are deductions (accelerated depreciation, amortization of various assets, etc.) for which the full tax benefit has been received; the section 57(a)(6) stock option item, in contrast, is an income item, and Congress had to make a policy decision as to what valuation methods should be used to measure the "economic income" (S. Rept. 91–552 (1969), 1969–3 C.B. 423, 495), derived from stock options qualified under section 421.

The assumption underlying the disputed regulation appears to be that Congress intended to prescribe the section 83 valuation method for minimum tax purposes because it measures the amount of income that would be subject to immediate income tax, and therefore the amount subject to preferential deferral, but for section 421. Thus, the regulation would treat as a tax preference item the full amount of the spread between the option price and the public trading value of the taxpayer's shares (subject only to nonlapse restrictions) as of the date he exercised his option. But the stock could not have been sold at the full public trading value when it was received and may never be salable at that price. The disputed regulation, therefore, has the effect of imposing the minimum tax not on "economic income" but on "value" which the taxpayer has not received and which he may never receive and without any possible recoupment through capital loss or other deductions. A conclusion that the statute produces that result should, in my judgment, be supported by a clear expression of legislative intent, and I do not find any evidence of such intent. To the contrary, in defining the term "fair market value," I think Congress made a policy judgment when it omitted from section 57(a)(6) the parenthetical language contained in section 83(a) and intended the term "fair market value" as used in section 57(a)(6) to have its traditional meaning. In the words of Justice Powell in *Kolom v. Commissioner, supra*: "Any other understanding of the term would defeat the purpose §§ 57, 421 and 422 were designed to serve."

I have a very healthy regard for Treasury regulations. They

serve a salutary purpose which is vital to the administration of the income tax laws, and they are entitled to great deference. But the Supreme Court has repeatedly stricken down Treasury regulations which are inconsistent with, or go beyond, the statute they are designed to implement. See, e.g., *United States v. Cartwright, supra* at 557; *Rowan Cos. v. United States*, 452 U.S. 247 (1981); *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982). It is true that privately imposed stock sales restrictions are subject to manipulation and that spurious restrictions may cause abuses. But, as discussed above, the minimum tax provides none of the ameliorating offsets available in computing the income tax, and the disputed regulation reaches not only spurious restrictions but all nonlapse restrictions, including restrictions mandated by statute, such as the one in the instant case. I think the Court is here compelled to hold the regulation invalid.

TANNENWALD, FAY, IRWIN, STERRETT, GOFFE, and KÖRNER, *JJ.*, agree with this concurring opinion.

SIMPSON, *J.*, dissenting: Once again, I must disagree with the majority of this Court over its role in reviewing Treasury regulations. In holding invalid section 1.57–1(f)(3), Income Tax Regs., the Court has relied on a narrow and literal interpretation of the statute and has declined to consider the purpose of section 57(a)(6) and whether its interpretation will carry out that purpose.

What our role should be in reviewing regulations was described by the Supreme Court in *United States v. Correll*, 389 U.S. 299, 306–307 (1967), when it said:

we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. §7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." *Commissioner v. Stidger*, 386 U.S. 287, 296. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. * * *

See *Bingler v. Johnson*, 394 U.S. 741, 749–751 (1969).

The Supreme Court, in strong and unequivocal terms, has repeatedly declared that the Treasury regulations should not be struck down lightly (see, e.g., *Bingler v. Johnson, supra* at 749–750; *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Colgate v. United States*, 320 U.S. 422, 426 (1943); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Brewster v. Gage*, 280 U.S. 327, 336 (1930)), and—

it is fundamental, of course, that as "contemporaneous constructions by those charged with administration of" the Code, the Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," and "should not be overruled except for weighty reasons." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501. * * * [*Bingler v. Johnson*, 394 U.S. at 749–750.]

See Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 398, 404 (1941).

Both section 83 and the minimum tax were enacted as parts of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487. In section 83, Congress made clear that the regular income tax is to be imposed on a compensatory bargain sale of property, and it expressly provided that such objective could not be frustrated even though the property was sold subject to restrictions on its transferability. In enacting the minimum tax, Congress decided that a minimum tax should be imposed on certain items of tax preference, including the acquisition of stock pursuant to a qualified stock option under section 422, but in enacting that provision, it neglected to deal expressly with the effects of restrictions on the transferability of the stock. The Treasury regulations have adopted a position that to carry out the purpose of the minimum tax, the rules of section 83 should be applied in determining the fair market value of stock acquired pursuant to such an option. Our question, and our sole question, is whether there is a reasonable basis for adopting that position.

The tax treatment of compensatory bargain sales has long been a troublesome subject. In *LoBue v. Commissioner*, 22 T.C. 440 (1954), this Court held that when an employee was allowed to purchase the stock of his employer at a bargain, the arrangement was to encourage the employee to acquire a proprietary interest in the business and resulted in no compensation. Although our decision was affirmed by the Third Circuit (223 F.2d 367 (1955)), it was reversed by the

Supreme Court (351 U.S. 243 (1956)). The Supreme Court held that when an employee was allowed to purchase stock at a bargain because of his employment, he received additional compensation. 351 U.S. at 247.

Despite that holding by the Supreme Court, two decisions by this Court made it possible, in many situations, to avoid a tax on a compensatory bargain sale. In *Lehman v. Commissioner*, 17 T.C. 652 (1951), we were faced with a situation in which a taxpayer had purchased at a bargain price stock subject to a restriction and reported no income at that time as a result of the restriction. When the restriction expired, the Commissioner sought to tax the bargain element as additional compensation, but we held that the expiration of the restriction was not a taxable event. 17 T.C. at 654. In *Kuchman v. Commissioner*, 18 T.C. 154 (1952), an employee was sold stock subject to the restriction that he could not sell it for a period of 1 year, and as a result of that restriction, this Court found that the stock had no ascertainable fair market value and that, therefore, the employee did not realize any additional compensation as a result of the bargain sale to him. 18 T.C. at 163. Thus, as a result of the *Lehman* and *Kuchman* decisions, an employee could be sold stock at a bargain, and if the stock was subject to a restriction, the employee was not taxable when he acquired the stock or when the restriction lapsed.

The Treasury refused to accept the consequences of the *Lehman* and *Kuchman* decisions and adopted regulations designed to tax compensatory bargain sales. Secs. 1.61–2 and 1.421–6, Income Tax Regs., as set forth in T.D. 6416, 1959–2 C.B. 126. Under such regulations, if a compensatory bargain sale of property was made to an employee subject to a restriction which significantly affected its value, the employee was considered to have received additional compensation when the restriction lapsed, and the amount of such compensation was the difference between the price paid for the property and the lesser of its fair market value when he acquired it or when the restriction lapsed. Yet, Congress considered that such rules provided unduly preferential tax treatment for compensatory bargain sales of restricted stock.

In explaining the reasons for enacting section 83, the Ways and Means Committee declared:

The present treatment of restricted stock plans is significantly more

generous than the treatment specifically provided in the law for similar types of deferred compensation arrangements. Under present law an employee is taxed in full when his employer makes a contribution for his benefit to an employees' pension or profit-sharing trust which does not meet the nondiscrimination and other requirements set forth in the tax law, if his interest in the contribution is nonforfeitable. (A similar rule applies where an employer purchases an annuity for an employee). If an employer transfers stock to such an employees' trust for an employee and the trust provides that the employee will receive the stock at the end of 5 years if he is alive at that time, the employee would be treated as receiving, and would be taxed on, compensation in the amount of the value of the stock at the time of the transfer.

However, if the employer, instead of contributing the stock to the trust, gives the stock directly to the employee subject to the restriction that it cannot be sold for 5 years, then the employee's tax is deferred until the end of the 5-year period. The disparity of treatment between the two situations becomes even more apparent when it is considered that in the situation where the employee has substantially less than full control of the stock (the nonexempt trust situation) he is taxed currently on the full value of the stock, while in the case where the employee actually possesses the stock, can vote the stock, and receives the dividends on the stock (the restricted stock plan), his tax is deferred. [H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 254.]

See also S. Rept. 91–552 (1969), 1969–3 C.B. 423, 500.

To prevent the preferential treatment of compensatory sales of restricted stock, section 83 provides that whenever an employee acquires a transferable or vested interest in such stock, he is taxable on the bargain sale at such time, and the bargain is to be measured by the difference between the fair market value of the stock at such time and the price paid for it. For such purposes, section 83 expressly provides that in determining the fair market value, restrictions that will lapse are to be disregarded. H. Rept. 91–413 (Part 1), *supra*, 1969–3 C.B. at 254; S. Rept. 91–552, *supra*, 1969–3 C.B. at 501. However, such rules are not to apply to transfers of stock pursuant to the exercise of a qualified stock option. Sec. 83(e); H. Rept. 91–413 (Part 1), *supra*, 1969–3 C.B. at 255; S. Rept. 91–552, *supra*, 1969–3 C.B. at 501.

Section 83 was included in the Tax Reform Act of 1969 as passed by the House of Representatives, and when the bill was before the Senate Finance Committee, Assistant Secretary of the Treasury for Tax Policy Edwin S. Cohen was asked about the effect of restrictions on the sale of stock to employees and responded:

Restrictions which lapse at some future time serve no essential business purpose but are used principally to affect the tax consequences. They may properly be disregarded for income tax purposes under these conditions. * * * [Hearings before the Senate Comm. on Finance (Part 1), 91st Cong., 1st Sess. 652 (1969).]

The concept of a minimum tax was first proposed by the Senate Finance Committee. In setting forth the reasons for such tax, the committee observed:

Under present law, many individuals and corporations do not pay tax on a substantial part of their economic income as a result of the receipt of various kinds of tax-exempt income or special deductions. * * *

> \* \* \* \* \* \* \*

The present treatment * * * results in an unfair distribution of the tax burden. * * *

> \* \* \* \* \* \* \*

The committee has adopted many provisions that are specifically designed to reduce the scope of existing tax preferences. However, the committee believes that an overall minimum tax on tax preferences is also needed to reduce the advantages derived from these preferences and to make sure that those receiving such preferences also pay a share of the tax burden. * * * [S. Rept. 91–552, *supra*, 1969–3 C.B. at 495.]

It was also the Senate that first proposed that the economic income received by the exercise of a qualified stock option should be treated as an item of tax preference subject to the minimum tax. S. Rept. 91–552, *supra*, 1969–3 C.B. at 497.

A review of this legislative history shows that section 83 was enacted in the light of the problems that had arisen in the tax treatment of compensatory bargain sales; it assures that when a compensatory bargain sale of restricted stock is taxable, the tax is to be imposed at the time of the sale, and restrictions that lapse are to be disregarded in measuring the bargain. Although the acquisition of stock pursuant to a qualified stock option is not subject to the regular income tax, the bargain element is considered an item of tax preference and is subjected to the minimum tax. The Treasury regulations take the position that for purposes of imposing the minimum tax, the rules of section 83 are to be applied in determining the amount of the bargain element subject to such tax. In my judgment, it is clear that such rule is necessary to carry out the manifest objective of the legislation.

An employee who acquires stock under a qualified stock option may wholly avoid the minimum tax if the rules of

section 83 are not applied to measure the bargain received by him. For example, if he acquires stock having a fair market value of $30,000 for a price of $20,000, and if the stock is subject to a restriction on transferability which he claims reduces its value to $20,000, there is a potential dispute in every case over the effect of the restriction on fair market value—how much is the fair market value reduced by the restriction? If it is ultimately determined that the restriction does reduce the fair market value by $10,000, then the transfer is not subject to the minimum tax, even though the employee has received economic income: after the expiration of the restriction, he owns stock worth considerably more than he paid for it. Moreover, the restriction may have little effect in economic reality since section 422 requires him to hold the stock for a 3-year period in order to secure the exemption from the regular income tax. Thus, a restriction, such as we have in this case, will expire by the time the employee satisfies the requirement of section 422. After the expiration of the 3-year holding period required by section 422, he owns stock worth considerably more than he paid for it, and then he is free to transfer it.

It has been suggested that sections 83(e) and 422 reflect a legislative policy to treat more favorably acquisitions of stock under a qualified stock option. *Kolom v. Commissioner*, 454 U.S. 1011 (1981) (Powell, J., dissenting from denial of certiorari). It is true that such acquisitions are treated favorably— they are not subjected to the regular income tax, but it does not follow from such provisions that such acquisitions are to be exempt from the minimum tax. On the contrary, section 57(a)(6) makes clear that Congress intended for acquisitions of stock under a qualified stock option to be subjected to such tax. The holding of the majority provides an obvious means for taxpayers to subvert that objective, and such possibility demonstrates that to carry out the objective of imposing the minimum tax on stock acquired by the exercise of a qualified stock option, the rules of section 83 must be applied for such purpose. If the regulations are not sustained, Congress will be required to amend section 57(a)(6) to assure that its objective is carried out.

DAWSON, WILBUR, and CHABOT, *JJ.*, agree with this dissent.