T.C. Summary Opinion 2002-155


UNITED STATES TAX COURT


JAMES V. ABRAMS AND LAURIE ABRAMS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10263-00S.                    Filed December 19, 2002.


David C. Johnston, for petitioners.

Matthew J. Bailie, for respondent.


ARMEN, Special Trial Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 1996, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1996 in the amount of $9,726.

The only issue for decision is whether petitioners sustained a deductible loss under section 165 on the sale of their former residence. We hold that they did not.

An adjustment to the amount of petitioners' allowable rental loss deduction under section 469 is a purely computational matter, the resolution of which is dependent on our disposition of the disputed issue.

Background

Some of the facts were stipulated, and they are so found. Petitioners, who are married, resided in Modesto, California, at the time that their petition was filed with the Court.

At all relevant times, petitioner James V. Abrams (Mr. Abrams) was employed as a district manager by Stewart Title Co. Petitioner Laurie Abrams (Mrs. Abrams) has more than 20 years of experience as a mortgage lender and listed her occupation as "property manager" on petitioners' joint Forms 1040, U.S. Individual Income Tax Return, for the taxable years 1995 and 1996.

In March 1991, petitioners purchased a house located at 504 Stewart Road, Modesto, California (Stewart property), for $484,950. The Stewart property is approximately 4,200 square feet with four bedrooms, three baths, and a 1,000 square foot

basement, and is situated on approximately half an acre of land. The property is located on a two-lane access road that leads into the neighboring residential subdivision and into the Del Rio Country Club, which is considered a prestigious section of Modesto. From March 1991 through June 1995, petitioners occupied the Stewart property as their personal residence. Mrs. Abrams testified that during this period they expended approximately $70,000 for improvements on the house, such as a swimming pool and backyard landscaping, thereby increasing their total investment in the property to approximately $554,950.

In 1993, Mr. Abrams earned an annual income of approximately $350,000. Due to a decline in the real estate market, however, Mr. Abrams' salary decreased to approximately $230,000 in 1994 and approximately $150,000 in 1995. As a result, sometime in early 1995 petitioners determined that they could no longer afford the $3,800 monthly mortgage on the Stewart property. Petitioners attempted to sell the property themselves for several months, but did not receive any offers. At this time, the Modesto real estate market was in the midst of a 5-year downtrend. Sales of high-end homes were particularly sluggish. Thus, petitioners considered selling or leasing the property, whichever opportunity presented itself.

In June 1995, petitioners found a prospective tenant, Ms. Elizabeth Szilagyi (lessee), to lease the property from July 1,

1995 through June 30, 1996 with a move-in date of July 7, 1995. The written lease agreement required the lessee to pay in advance the annual rent of $28,000 as follows: $5,000 deposit due by June 8, 1995 and the remaining balance due by July 1, 1995. The lease further provided: (1) The property would remain on the market with Prudential Real Estate; (2) the lessee would have the right of first refusal or receive a prorated refund of the prepaid rent if the property sold before the end of the lease term; (3) any unused rents would be credited as a downpayment if the lessee purchased the property before the end of the lease term; and (4) the lease would run month-to-month at the end of the lease term with a monthly rent of $2,300.

By the end of June 1995, petitioners moved out of the Stewart property and into another home, which they rented for $1,000 per month. Petitioners prepaid 6 months of this rent from the funds received from the lessee and applied the remaining funds toward the Stewart property mortgage. Petitioners did not obtain an appraisal of the Stewart property at any time before they moved out nor at any time before the lease term began. For the taxable year 1995, petitioners claimed a depreciation deduction on the Stewart property of $5,999.

Also in June 1995, petitioners selected Dennis Lilly of Prudential Real Estate (Mr. Lilly) to be their exclusive listing agent for a 6-month period. Mr. Lilly has been a real estate

agent in the Modesto area since about 1987.  Petitioners informed
Mr. Lilly that they already had a tenant in line to rent the
Stewart property.  On June 29, 1995, the Stewart property was
listed for sale at $484,900.  Sales efforts were unsuccessful,
which led to a reduction in the sales price over a 5-month period
as follows:

| Date Listed for Sale | Amount Listed for Sale |
|---|---|
| July 12, 1995 | $469,000 |
| September 13, 1995 | 459,000 |
| November 3, 1995 | 435,000 |

Throughout this period, Mr. Lilly held two open houses and showed
the property approximately six to nine times but never received
an offer.

After the end of the lease term in June 1996, the lessee
continued to rent the Stewart property on a monthly basis from
July 1 through December 27, 1996.  On December 27, 1996,
petitioners sold the Stewart property under an installment land
contract to the lessee for $435,000.[2]

Petitioners timely filed a joint Form 1040 for 1996.  On
their return, petitioners claimed a deduction for a $39,001 loss
on the sale of the Stewart property calculated as follows:

| | |
|---|---|
| Sales Price | $435,000 |
| Less Accumulated Depreciation | 5,999 |
| Less Basis | 480,000 |
| Total Loss | (39,001) |

---

[2]  So stipulated by the parties.

In the notice of deficiency, respondent disallowed the loss deduction resulting from the sale of the Stewart property because petitioners did not establish that their basis in the property exceeded the net proceeds from the sale. In the alternative, respondent disallowed the loss deduction on the ground that the loss was not from a transaction entered into for profit, to wit: temporarily renting the Stewart property while it was available for sale.

At trial, respondent introduced into evidence the Residential Property Appraisal Record of the county assessor's office, which indicated the assessed value for tax purposes of the Stewart property as follows:

| Assessment Year | Total Real Estate | Land | Improvement |
|---|---|---|---|
| 1992 | $494,700 | $122,400 | $372,300 |
| 1993 | [1]440,000 | 120,000 | 320,000 |
| 1994 through 1996 | [2]400,000 | 80,000 | 320,000 |

[1] The phrase "Prop 8" appears above the amount of $440,000. See infra p. 12.

[2] The phrase "Prop 8" appears above the amount of $400,000. See infra p. 12.

Discussion

In general, the determinations of the Commissioner in a notice of deficiency are presumed correct, and the burden is on the taxpayer to show that the determinations are incorrect. Rule

142(a);[3] <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Section 165(a) allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. As relevant to the present case, section 165(c) limits the deduction for an individual taxpayer to losses either incurred in a trade or business, or in any transaction entered into for profit. It is a long-settled principle that a loss incurred by a taxpayer from the sale of his or her personal residence is not deductible except where prior to the sale the taxpayer abandons the use of the property as his or her personal residence and converts it to a profit inspired use. <u>Melone v. Commissioner</u>, 45 T.C. 501, 505 (1966); <u>Leslie v. Commissioner</u>, 6 T.C. 488, 493 (1946); sec. 1.165-9(a) and (b)(1), Income Tax Regs.; see <u>Heiner v. Tindle</u>, 276 U.S. 582, 584-585 (1928).

The loss allowed upon the sale of residential property converted to rental property is the excess of the adjusted basis (as prescribed in section 1.1011-1, Income Tax Regs.) over the amount realized from the sale. Sec. 1.165-9(b)(2), Income Tax Regs. As relevant to this case, the adjusted basis is the lesser of the following amounts at the time of conversion, reduced for

---

[3] Sec. 7491 provides that, under certain circumstances, the burden of proof is on the Secretary in court proceedings arising in connection with examinations commencing after July 22, 1998. Accordingly, sec. 7491 is inapplicable in the present case because respondent commenced petitioners' examination before July 22, 1998.

depreciation for the period after conversion: (1) the fair market value (FMV), or (2) the adjusted cost basis, e.g., cost basis plus improvements. Heiner v. Tindle, supra at 587; Adams v. Commissioner, T.C. Memo. 1995-142; Higgins v. Commissioner, T.C. Memo. 1995-139; Frahm v. Commissioner, T.C. Memo. 1974-138; secs. 1.165-9(b)(2), 1.1011-1, Income Tax Regs. Although the Internal Revenue Code does not define the term "fair market value" for purposes of section 165, the universally accepted definition of this term has been the willing buyer-willing seller test under which FMV is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978); Gresham v. Commissioner, 79 T.C. 322, 326 (1982), affd. 752 F.2d 518 (10th Cir. 1985).

Our first inquiry is whether petitioners converted the Stewart property from personal use to an income-producing use. Whether a former residence used for personal purposes has been converted in the hands of the same taxpayer to property held for the production of income is a question of fact to be resolved with reference to the surrounding facts and circumstances. Newcombe v. Commissioner, 54 T.C. 1298, 1300-1301 (1970). We are

satisfied by the record that petitioners effectively converted the Stewart property into rental property when it was leased in July 1995, even though the lessee ultimately purchased it in December 1996.  See Higgins v. Commissioner, supra (residence effectively converted to rental property when it was leased to a third party with the option to purchase);  Rechnitzer v. Commissioner, T.C. Memo. 1967-55 (residence was effectively converted to rental property under bona fide lease where the lessee subsequently purchased the property).

The next inquiry is whether petitioners sustained a loss on the sale of the Stewart property.  Petitioners contend that the FMV at the time of conversion was $480,000, whereas respondent contends that the FMV was $435,000.  Because both of these figures are lower than petitioners' adjusted basis of $548,951,[4] the determinative issue is what was the FMV of the Stewart property as of July 1995.

Petitioners argue that the final sales price of $435,000 in December 1996 is not an accurate reflection of the FMV of the Stewart property in July 1995 because the sales price was the result of a distressed sale where petitioners were compelled to sell quickly at a price far below its true FMV of $480,000. Given the record before us, we disagree.

---

[4] Calculated as:  Cost basis plus improvements less depreciation ($484,950 + 70,000 - 5,999).

Petitioners' claim of a distressed sale is unpersuasive because at all relevant times they did not receive any offers for the Stewart property. Even assuming arguendo that petitioners sold under distress, the record demonstrates that there was not a willing buyer at any time between June through November 1995 when the property was listed from $484,900, to $469,000, then $459,000, and finally $435,000, which petitioners contend is a price far below the purported FMV of $480,000. Both Mrs. Abrams and Mr. Lilly also testified that in 1995 real estate values were at their lowest levels especially for high-end homes. However, Mr. Lilly testified that a house similar to the Stewart property would have likely sold in a 6-month period of time if it were listed at its FMV. The fact that the property would not sell for $435,000 in November 1995 and that it did sell for $435,000 in December 1996 indicates that the Stewart property was worth at least as much in 1996 as it had been in 1995. Thus, we do not find that the sales price of $435,000 was the result of a distressed sale. See Adams v. Commissioner, supra (held that the property's sales price was below FMV because the taxpayer was under a threat of foreclosure, was 2 years behind in paying property taxes and the buyers were taking subject to an existing lease on the property).

Further, petitioners bear the burden to prove what the FMV of the property was in July 1995. Petitioners did not obtain an

appraisal at the time of conversion, but Mrs. Abrams testified that she based her professional opinion on such factors as the sluggish real estate market, the home sales in the area as listed in the multiple listing service, the fact that the Stewart property was one of the most expensive houses in the county, which would typically take months or years to sell, and the prestigious location of the property. While Mrs. Abrams may have some knowledge of real estate values through her experience in the mortgage lending business, we are not required to accept such self-serving testimony without corroborating evidence. Niedringhaus v. Commissioner, 99 T.C. 202 (1992).

Mrs. Abrams offered no records of the alleged comparable sales, nor any information or data therefrom and, as a consequence, we have no way of knowing whether they would tend to sustain or refute her stated opinion that the Stewart property's purported FMV in 1995 was $480,000 such that respondent's determination would be incorrect. On the other hand, Mr. Lilly testified that based on his evaluation of the prior sales of comparable properties in the area, he thought the original list price of $484,900 in July 1995 was a little high but hoped that a buyer would purchase the home for more than what it was worth because of the special financing terms that petitioners were offering.

The evidence also indicates that the Stewart property's

assessed value for tax purposes in 1995 and 1996 was $400,000.
Under California law, however, assessment values may not be
determinative of FMV because the assessed value is generally
limited to a 1-percent increase on the property's base year
value, i.e., the property's 1975-76 market value level or
appraised value when purchased. Cal. Const. art. XIII(A), secs.
1 and 2 (West 1996); Cal. Rev. & Tax Code, sec. 110(a) (West
1998). However, when the property's FMV falls below the base
year value, the assessed value for tax purposes would be based on
the property's FMV until the base year value is restored. Cal.
Const. art. XIII(A), sec. 2(b) (West 1996);[5] Cal. Rev. & Tax
Code, sec. 51(a) (West 1998). Thus, although the county
assessor's appraisal record is not determinative of the Stewart
property's FMV, it is persuasive evidence that petitioners'
estimate was overly inflated given the state of the real estate
market in 1995.

The Court is satisfied from the record that the FMV of the
Stewart property in July 1995 was $435,000. The fact that the
property languished on the market with an asking price of
$435,000 in November 1995 indicates that the value of the house

---

[5] On Aug. 18, 1978, the Cal. Legislature adopted Senate
Const. Amend. No. 67, which was eventually designated as
Proposition 8 and placed on the ballot and submitted to electors
at the 1978 General Election. On Nov. 7, 1978, the voters
adopted Proposition 8, which amended Cal. Const. art. XIII(A),
sec. 2, specifically providing a temporary reduction in the base
year value to reflect a decline in real property value.

at the date of conversion was substantially less than petitioners' purported FMV of $480,000.  Further, the fact that the property eventually sold for $435,000 in December 1996 indicates there had been little if any change in its FMV from July 1995 until the date of its sale.

For the above reasons, we hold that the FMV of the Stewart property in July 1995 was $435,000, and, therefore, petitioners did not sustain a loss on the subsequent sale of the Stewart property on December 27, 1996, for $435,000.  Accordingly, we sustain respondent's determination on this issue.[6]

We have considered all of the other arguments made by the parties, and, to the extent that we have not specifically addressed them, we conclude they are without merit.

---

[6]  Accordingly, petitioners have a gain in 1996 in the amount of $5,999 calculated as follows:

| | |
|---|---|
| Sales Price | $435,000 |
| Less Adjusted Basis ($435,000 FMV less $5,999 depreciation) | 429,001 |
| Total Gain | 5,999 |

However, at trial respondent waived any increased deficiency for 1996.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>