ESTATE OF Louis B. GRESHAM, Deceased, Thomas D. Gresham and Plaza Bank and Trust Company, Co-Executors, and Margaret S. Gresham, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 83–1165.

United States Court of Appeals,
Tenth Circuit.

Jan. 17, 1985.

Stanley P. Weiner, Kansas City, Mo., for petitioners-appellees.

Kenneth L. Greene, Washington, D.C. (Michael L. Paup and Gary R. Allen, Dept. of Justice, Washington, D.C., with him on the briefs), for respondent-appellant.

Before BARRETT and McKAY, Circuit Judges, and BURCIAGA *, United States District Judge.

BARRETT, Circuit Judge.

In order to determine "fair market value" under section 57(a)(6) of the Internal Revenue Code of 1954 (26 U.S.C.) (the "Code") for purposes of the "minimum tax," [1] Treas.Reg. section 1.57–1(f)(3) (1978) directs a taxpayer to apply the principles found in section 83(a)(1) of the Code. A majority of the Tax Court concluded that the application of section 83(a)(1) valuation principles was inconsistent with the plain language of section 57(a)(6) and thus held section 1.57–1(f)(3) invalid insofar as it requires the fair market value of stock acquired pursuant to the exercise of a qualified stock option to be determined without regard to restrictions other than those which by their terms will never lapse. 79 T.C. 322, 79 T.C. No. 20 (1982). The narrow issue presented in this appeal is whether section 1.57–1(f)(3) is inconsistent with section 57(a)(6) in that regard. We have jurisdiction under 26 U.S.C. § 7482.

The facts relevant to this appeal are undisputed and may be briefly summarized.

Louis Gresham (taxpayer) was president, a director, and a member of the executive committee of General Energy Corporation (GEC). During 1974, 1975, and 1976, taxpayer acquired unregistered stock of GEC by exercising a qualified stock option granted to him by GEC in 1973.

In order for the transaction granting taxpayer this option to be exempt from federal securities registration requirements, each time taxpayer exercised his option he was required to execute an investment letter in which he agreed not to sell or transfer the shares unless: (1) the stock had been registered; (2) the Securities and Exchange Commission (SEC) had stated that such sales could be made without registration; or (3) GEC received an opinion from counsel satisfactory to GEC to the effect that a sale could be made without registration of the stock. Additionally, taxpayer agreed that a stop transfer order would be placed against the shares with GEC's transfer agent. Finally, the stock certificates bore a legend stating that the shares were not registered and could not be transferred or sold until counsel issued a written opinion satisfactory to GEC that such sale or transfer would not require registration of the stock.

By executing the investment letter, taxpayer was prohibited, under SEC rulings, from selling or transferring the stock for a period of two years, unless a registration statement was in effect with respect to the shares. (As stated earlier, no such statement was in effect on the dates of issuance of taxpayer's shares.) In any private placement of the option stock, the SEC would also have required the purchaser to execute a similar investment letter.

During the years in question, taxpayer calculated his minimum tax liability by first determining the bid prices for GEC stock traded on the over-the-counter market on the dates he exercised the option and then discounting the total value of each block of shares purchased by 33⅓ percent, reporting this discounted value as the "fair market value" of the shares so acquired. (This discounted value represented the value taxpayer would receive if he sold the shares in a private placement.) Taxpayer then subtracted from this discounted value his cost for the option shares; this amount taxpayer reported as his tax preference income.

In determining deficiencies for the years 1975 and 1976,[2] the Commissioner of Internal Revenue (Commissioner) valued the option shares using the over-the-counter,

---

* The Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation.

1. *See infra,* note 3.

2. Taxpayer paid no minimum tax in 1974 as a result of carryovers allowable at that time.

rather than the private placement, value of the shares. The Commissioner thus ignored the effect of the investment letter restrictions on the basis of Treas.Reg. § 1.57–1(f)(3). The parties stipulated that if section 1.57–1(f)(3) is valid and applicable, taxpayer will concede the deficiencies as assessed in the statutory notice. Conversely, they have stipulated that if, as the Tax Court concluded, section 1.57–1(f)(3) is invalid or inapplicable, the fair market value of the option shares is the discounted value as contended by taxpayer.

Section 56[3] of the Code imposes a minimum tax, in addition to all other taxes imposed by the Code, on "items of tax preference." Section 57 of the Code lists those items of tax preference subject to the

minimum tax, and section 57(a)(6),[4] which is at issue in this appeal, provides as follows:

§ 57. Items of tax preference.

(a) In general.—For purposes of this part, the items of tax preference are—

\* \* \* \* \* \*

(6) Stock options.—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the *fair market value* of the share at the time of exercise exceeds the option price. (Emphasis added.)

 "Fair market value" is not defined in section 57. It is defined, however, in Treas.Reg. section 1.57–1(f)(3), which utilizes the valuation principles of section 83[5]

---

3. As added by section 301(a), Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487, and as amended in 1971, section 56(a) provided as follows:

§ 56. Imposition of Tax.

(a) In General.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

(1) the sum of the items of tax preference in excess of $30,000, is greater than

(2) the sum of—

(A) the taxes imposed by this chapter for the taxable year (computed without regard to this part and without regard to the taxes imposed by sections 72(m)(5)(B), 402(e), 408(f), 531, and 541) reduced by the sum of the credits allowable under—

(i) section 33 (relating to foreign tax credit),

(ii) section 37 (relating to retirement income),

(iii) section 38 (relating to investment credit),

(iv) section 40 (relating to expenses of work incentive programs),

(v) section 41 (relating to contributions to candidates for public office),

(vi) section 42 (relating to credit for personal exemptions), and

(vii) section 44 (relating to credit for purchase of new principal residence); and

(B) the tax carry overs to the taxable year.

\* \* \* \* \* \*

Among other changes, the 1976 amendments to section 56(a) raised the minimum tax rate for individuals to 15% and substituted provisions relating to exemptions of $10,000 or one-half of regular tax liability, whichever is

greater, for provisions relating to the $30,000 exemption and deduction for regular taxes.

4. Section 422A (26 U.S.C.), enacted in section 251(a), Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172, replaced qualified stock options with incentive stock options. The difference between the fair market value of the option share at the time of exercise and the option price is also subject to the minimum tax. See section 57(a)(10), enacted in section 201(b)(1)(c), Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324.

5. Sec. 83(a) reads as follows:

(a) General Rules.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become

of the Code. Section 1.57–1(f)(3) provides, in relevant part, that "[i]n accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option *is to be determined without regard to restrictions (other than non-lapse restrictions within the meaning of § 1.83–3(h)).*" (Emphasis added.) It is undisputed that the investment letter restrictions of taxpayer's option stock are restrictions which, by their terms, might lapse. It follows, then, that unless section 1.57–1(f)(3) is invalid or inapplicable, the deficiencies assessed against taxpayer under the authority of section 1.57–1(f)(3) must be upheld. In making this determination, we must not simply defer to the Commissioner's construction of section 57(a)(6), although that construction is entitled to great deference. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Treasury regulations are not absolute rules of law; consequently, they should not be followed when they are inconsistent with the purpose of the Code section in question or exceed the administrative authority granted. *Reardon v. United States*, 491 F.2d 822, 824 (10th Cir. 1974), *citing National Labor Relations Board v. Boeing Co.*, 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973).

■ Though it cannot be disputed that section 57(a)(6) does not contain the language in section 83(a)(1) directing that fair market value be determined without regard to restrictions which by their terms might lapse, we should infer such, argues the Commissioner, because the sections were designed to achieve similar results. Both sections were added to the Code by the Tax Reform Act of 1969, Pub.L. 91–172, 83 Stat. 487. The minimum tax bill was designed to distribute more fairly the tax burden by taxing items of "economic income." See S.Rep. No. 91–552, 91st Cong., 1st Sess. at 111–112 (1969–3 Cum.Bull. 423,

494–495), U.S.Code Cong. & Admin.News 1969, 1645. Here, according to the Commissioner, taxpayer realized economic income when he exercised his stock option in the amount of the bargain element—the difference between fair market value and option price—of the option shares. Were it not for the preferential treatment accorded by sections 421 and 422,[6] this bargain element would be subject to immediate *income* tax under section 83(a)(1). In an effort to limit the tax avoidance prospects of these sections for high bracket taxpayers, argues the Commissioner, Congress enacted the minimum tax, which subjects this bargain element to a tax in addition to other taxes imposed by the Code. Consequently, reasons the Commissioner, it is incongruous to think Congress would have defined "fair market value" differently in section 57(a)(6) from the way it is defined in section 83(a)(1) if, by doing so, high bracket taxpayers could avoid the minimum tax simply by subjecting the option shares to restrictions such as those that are at issue here.

The Commissioner's assertion that the bargain element represents economic income begs the very issue which is raised by taxpayer's challenge to section 1.57–1(f)(3) —whether, but for the regulation, "fair market value" would include a discount for the effect of the letter investment restrictions. This issue was addressed by the Court in *Harrison v. United States*, 475 F.Supp. 408 (E.D.Pa.1979), *aff'd without published opinion*, 620 F.2d 288 (3d Cir. 1980), though in a different context. The option stock in *Harrison* was subject to the restrictions imposed by section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1976). Section 16(b) requires a corporate insider who sells option shares to return to the corporation any short-swing profits he receives upon the sale. In upholding the validity of the regulation in this context, the court viewed as significant the

transferable or not subject to a substantial risk of forfeiture.

**6.** *Assuming* taxpayer satisfies the technical requirements of these sections, including the requirement that he hold the shares for three

years, taxpayer realizes income only when he sells or otherwise disposes of the shares. When taxpayer does ultimately dispose of the shares, his gain receives capital gains treatment.

fact that, although section 57 had been amended several times—in 1971, 1976 and 1977—after section 1.57–1(f)(3) had been proposed, section 57(a)(6) remained unchanged. The court viewed this "congressional inaction" as "silent testimony that the regulation forwards the congressional intent" of section 57(a)(6). *Harrison, supra*, 475 F.Supp. at 414. Even assuming the invalidity of section 1.57–1(f)(3), the *Harrison* court said in dictum, still the Commissioner's determination of the fair market value of the option shares would be upheld because section 16(b) had no "impact whatsoever upon the fair market value of the [option shares]." *Harrison, supra*, 475 F.Supp. at 415. This is so, said the court, because section 16(b) does not *preclude* a taxpayer from selling his option shares; it merely acts as a disincentive from his doing so. *Id. Accord Kolom v. Commissioner*, 71 T.C. 235 (1978), *aff'd*, 644 F.2d 1282 (9th Cir.1981), *cert. denied*, 454 U.S. 1011, 102 S.Ct. 548, 70 L.Ed.2d 412 (1981).

We find unpersuasive the *Harrison* court's reasoning that congressional inaction with respect to section 57(a)(6) is tantamount to acquiescence. Section 1.57–1(f)(3) was initially proposed on December 30, 1970, but was not finally adopted until September 12, 1978. Since section 1.57–1(f)(3) was only in proposed form during that eight-year period, it was unnecessary for Congress to focus on it while amending section 57. Indeed, the Commissioner concedes "that Congress may not have been focusing in on the provisions of Section 57(a)(6) at that time, . . . ." Brief For The Appellant at 30. These facts, in our view, rebut *Harrison's* finding of congressional adoption of section 1.57–1(f)(3) by acquiescence. *See, e.g., Lykes v. United States*, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791 (1952).

Having rejected the view that section 1.57–1(f)(3) was adopted by acquiescence, we are left to speculate on the meaning of "fair market value" in section 57(a)(6). The Commissioner concedes that "fair market value" in other provisions of the Code is generally determined using the "willing buyer/willing seller" test originally an-

nounced in *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). *See, e.g.,* Treas.Reg. § 20.2031–1(b). (The Commissioner apparently does not dispute the fact that use of this test would result in the private placement value being used as the "fair market value.") He contends, however, that even though fair market value has a well-defined meaning elsewhere in the Code, that meaning should not be applied here because it is inconsistent with the purpose behind section 57(a)(6) of taxing "economic income."

While we agree that section 57(a)(6) was designed to reach economic income, we do not agree that taxpayer received economic income when he exercised his stock option. Unlike the restrictions in *Harrison* and *Kolom*, the letter investment restrictions here *precluded* taxpayer from selling his shares except in a private placement. That private placement value was substantially below the public trading price for those same shares. Consequently, by requiring taxpayer to compute fair market value by using the full public trading value for his option shares, the Commissioner's method of valuation has the effect not of taxing "economic income," but of taxing "value" which taxpayer has not received and might never receive.

Given that Congress could have achieved this result in 1969 simply by including the section 83 fair market value language in section 57(a)(6), we agree with Justice Powell that "the failure to include any similar qualification in § 57 strongly suggests that [Congress] intended to use 'fair market value' in its traditional and well-established sense." *Kolom, supra*, 454 U.S. 1016, 102 S.Ct. 551 (dissenting from the denial of certiorari). We also agree with Justice Powell's statement, adopted by the Tax Court majority, explaining from a policy standpoint the different use of language in these sections: "It is this policy of encouraging employee stock ownership that explains why the language of section 57 and section 83 differs." *Id.* Since the Commissioner concedes that "Congress did, of course, encourage the use of qualified stock options with the passage of Section

421 [and 422]," Brief For The Appellant at 28, we reject the Commissioner's construction of section 57(a)(6) as inconsistent with the congressional intent of encouraging employee stock ownership.

The Commissioner draws our attention to section 555 of the Tax Reform Act of 1984, which amended section 57(a)(10) to provide that in the case of incentive stock options, "the fair market value of a share of stock shall be determined [for minimum tax purposes] without regard to any restriction other than a restriction which, by its terms, will never lapse." Subsequent legislation is entitled to some weight in determining what a previous Congress meant. *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958). Here, however, to read into the plain language of section 57(a)(6) the section 83 meaning of "fair market value" is to reject the "willing buyer-willing seller test of fair market value [which] is nearly as old as the federal income, estate, and gift taxes themselves, ...." *Cartwright,* *supra,* 411 U.S. at 551, 93 S.Ct. at 1716. We decline to do so without a clear expression of legislative intent.

AFFIRMED.