PRENTICE I. ROBINSON AND ROSALIE ROBINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CENTRONICS DATA COMPUTER CORP. AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robinson v. Commissioner
Docket Nos. 18038-80, 2951-82.
United States Tax Court
T.C. Memo 1985-275; 1985 Tax Ct. Memo LEXIS 360; 50 T.C.M. (CCH) 89; T.C.M. (RIA) 85275; June 6, 1985; As Amended July 25, 1985 *360 Held: Value of stock obtained pursuant to exercise of stock option determined under section 83(a). Jerome S. Hertz,Elizabeth B. Burnett,David S. Crane,Steven S. Harwood, and Maxwell D. Solet, for the petitioners in docket No. 18038-80. Dennis I. Meyer and Bertrand M. Harding, Jr., for the petitioners *361 in docket No. 2951-82. David N. Brodsky, for the respondent. WHITAKER MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: The sole issue presently before the Court is the value of 153,000 shares of stock under section 83(a). [1] Certain separate legal questions in these consolidated cases previously were severed from the remaining issues in both proceedings, and opinions resolving those questions appear at 82 T.C. 444 (1984) and 82 T.C. 467 (1984). The valuation question currently before us is the sole remaining issue to be resolved in docket No. 18038-80, although additional issues remain to be tried and decided in docket No. 2951-82. For convenience our Findings of Fact and our Opinion are combined.
To the extent that some of the facts relevant to this proceeding already were determined in our previous opinions, we will merely summarize them here and incorporate our prior opinions by reference. The stock that we *362 are called upon to value was purchased by Prentice I. Robinson (Robinson), one of the petitioners in docket No. 18038-80, by the exercise, on March 4, 1974, of a stock option granted to him by Centronics Data Computer Corp. and Subsidiaries (Centronics), petitioner in docket No. 2951-82. On that date, Robinson acquired 153,000 shares of Centronics stock by means of the option for $ .667 per share, although the stock was worth considerably more. On March 19, 1974, Centronics issued to Robinson a stock certificate representing these 153,000 shares. The stock certificate bore a legend which provided: The shares represented by this certificate have not been registered under the Securities Act of 1933 and may not be sold, offered for sale or otherwise transferred or disposed of unless a registration statement under such Act is in effect with respect thereto or unless the company has received an opinion of counsel satisfactory to it, that an exemption from such registration is applicable to said shares. The parties have stipulated that: (1) Upon exercising his option on March 4, 1974, Robinson owned approximately 3.2 percent of the total outstanding common stock of Centronics; *363 and (2) if the 1,200,000 Centronics shares held by Centronics management are excluded, on March 4, 1974 Robinson's shares represented approximately 4.3 percent of the total outstanding Centronics stock. When Robinson and Centronics entered into the subject option agreement in early 1969, there was no public market for Centronics stock. At that time, Centronics was closely held, with most of its stock owned by its President and Vice President. A public offering of newly-issued shares of Centronics stock took place in August 1969, after which time the stock was traded over the counter until November 18, 1974, when the publicly held shares of Centronics were first listed for trading on the New York Stock Exchange. The average daily number of Centronics common shares traded during the period March 1974 through March 1975 was 16,215. During 1974 and 1975, the annual trading volume of Centronics stock was 4,068,000 and 3,559,600 shares, respectively. The 1974 monthly trading volume was as follows: 1974
January
331,600
February
288,800
March
415,100
April
327,100
May
395,500
June
237,800
July
349,400
August
276,700
September
338,800
October
566,100
November
266,500
December
274,600
TOTAL:
4,068,000
*364 During March 1974, daily trading volume ranged from 8,000 to 42,300 shares, and average daily volume amounted to 19,767 shares. On March 4, 1974, trading volume was 11,900 shares. Robinson's 153,000 shares of Centronics stock constituted approximately two full weeks of trading volume. The bid price of Centronics stock was approximately $30 per share in October 1973. It declined during November 1973, and during December 1973 and the first quarter of 1974 it was trading at between $16 and $21 per share. During this period the stock market generally was declining. On March 4, 1974, the average of the bid ($19.75) and the asked ($20.50) prices for Centronics shares was $20.125 per share. Much of the testimony in this proceeding consisted of comparisons between a hypothetical sale by Robinson and actual contemporaneous sales of Centronics stock by Caesars World, Inc. (Caesars World), which had certain business dealings with Centronics. By agreement, Centronics was obligated to register all shares owned by Caesars World under the Securities Act of 1933 upon the demand (and at the expense) of Caesars World. On October 31, 1973, a registration statement was filed with *365 the Securities and Exchange Commission (SEC) covering 400,000 shares of Centronics stock to be sold by Caesars World. On January 3, 1974, pursuant to an agreement dated December 20, 1973, Caesars World privately sold 200,000 of the shares to a Centronics supplier and its affiliate--133,333 shares to Brother International Corporation and 66,667 shares to Brother Industries, Ltd.--for $15 per share. This amount was a 21.6 percent discount from the average of the bid and asked prices of Centronics stock on January 3, 1974, a 19.5 percent discount from the average of the bid and asked prices on January 1, 1974, and a 24 percent discount from the average of the bid and asked prices of the previous 5 days. The additional 200,000 shares held by Caesars World were sold by means of a secondary offering on February 14, 1974. Forty-seven underwriters agreed to purchase specific amounts of the shares from Caesars World, and all 200,000 shares were offered to the public by the underwriters for $17.75 per share. All 200,000 shares were quickly acquired by the general public at the offering price. Caesars World incurred $1.30 per share for underwriting discounts and commissions [2] and *366 expenses which were estimated in the Prospectus to be approximately $1.38 per share. [3] Caesars World thus netted approximately $15.08 per share on this transaction. This net price was a 20.1 percent discount from the average of the bid and asked prices of Centronics stock on February 12, 1974 [4] and a 20.3 percent discount from the average of the bid and asked prices on the previous 5 days. The offering price of $17.75 without deducting commissions and expenses was a discount of approximately 6 percent from the average of the February 12, 1974 bid and asked prices and the 5-day average. *367 The parties before us have three different definitions of fair market value in the context of this case. [5] Respondent contends on brief that Robinson's stock is to be valued without regard to any restrictions under Federal securities laws and also without regard to registration or selling costs that would have to be incurred in the event of a hypothetical secondary distribution, but with a blockage discount of approximately 6 percent. Robinson argues that the stock's fair market value should be discounted 40 percent below the trading price to include a reduction for hypothetical registration and selling costs and a substantial blockage discount. Centronics believes that there should be no reduction for registration or selling costs and that no blockage discount is appropriate, because all 153,000 shares would have sold at no discount over the counter within a reasonable period of time. *368 Historically, the universally accepted definition of "fair market value" has been the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. U.S. v. Cartwright,411 U.S. 546, 551 (1973); Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982); Gresham v. Commissioner,79 T.C. 322, 326 (1982), affd. sub nom. Estate of Gresham v. Commissioner,752 F.2d 518 (10th Cir. 1985). Normally, the fair market value of shares of stock which are traded on the over-the-counter market is the mean between the highest and lowest quoted selling prices on the day in question, or, if actual prices either on or close to the valuation date are unavailable, the mean [6] between the bona fide bid and asked prices on the valuation date. Estate of McNary v. Commissioner,47 T.C. 467, 469-470 (1967); sections 20.2031-2(b)(1) and 20.2031-2(c), Estate Tax Regs. *369 Section 83(a) provides an exception to this traditional definition, however, by providing that fair market value is to be "determined without regard to any restriction other than a restriction which by its terms will never lapse." Although Robinson's stock here constituted "lettered" stock which could not be sold publicly without being first registered, we have held that, under the section 83(a) definition of fair market value, restrictions under Federal securities laws are to be disregarded. Pledger v. Commissioner,71 T.C. 618, 628-629 (1979), affd. 641 F.2d 287 (5th Cir. 1981), cert. denied 454 U.S. 964 (1981); [7]section 1.83-3(h), Income Tax Regs. An investment letter restriction such as the one present in this case thus is to be disregarded in determining fair market value, as the parties appear to understand. Another exception to the traditional definition of fair market value involves the concept of "blockage," where it is shown that the block of stock at issue "is so large in relation to the actual sales on the existing market that it could *370 not be liquidated in a reasonable time without depressing the market * * *." Section 20.2031-2(e), Estate Tax Regs. See Groff v. Munford,150 F.2d 825 (2d Cir. 1945); Commissioner v. Shattuck,97 F.2d 790 (7th Cir. 1938). Blockage is not a "restriction" within the meaning of section 83(a), and, accordingly, it may be regarded in determining fair market value, if properly proven. Robinson v. Commissioner,82 T.C. 467 (1984). With these two exceptions, the traditional concepts of fair market value in the estate and gift tax area and elsewhere are applicable. [8]
Questions of valuation--and particularly of blockage in the valuation of securities--are inherently factual in nature, with the trier of fact having to weigh all relevant evidence of value and to draw appropriate inferences. Hamm v. Commissioner,325 F.2d 934 (8th Cir. 1963), *371 cert. denied 377 U.S. 993 (1964), affg. a Memorandum Opinion of this Court. Robinson's expert witness, Lawrence H. Danzig, presented a study which concluded that Robinson's stock should be discounted 40 percent from the closing market price of Centronics common stock on March 4, 1974.He further expressed the opinion that "one could not dispose of this block of stock in a short period of time, up to 90 days, without experiencing an adverse impact on price." He assumed that, because the block of shares owned by Robinson was sufficiently large that it "could not have been disposed of in one day of normal trading and since the shares were not registered," the most appropriate means of selling the stock would have been by means of a private sale or a secondary distribution. In his secondary distribution analysis, he observed that the first step toward such a sale of a large block of stock is preparation of a registration statement and prospectus for the SEC, followed by review of that statement by the SEC, and a 20-day registration period before the stock is issued. Since the public becomes aware of the impending sale in advance of the actual sale date, but *372 the underwriters customarily do not become bound to purchase the stock until the actual sale date, he reasoned, the appropriate period during which to measure decline in stock value attributable to blockage--or "market pressure," as he calls it--started 60 trading days before registration and continued until 20 days after the date the stock was sold. He selected five companies (one of which was Centronics itself, the other four of which were, like Centronics, primarily manufacturers of computer components, and were relatively new, profitable companies, doing business in the United States) that had registered secondary distributions during 1974 and computed the closing market prices of those companies' stock at 20-day intervals during the relevant period. From these figures he created indices for each period, which represented the extent to which the average stock price during that period exceeded the price on the sale date. He termed this the "Average Stock Price Index." Noting the clear trend that the Average Stock Price Index for all five companies uniformly declined from the earliest period (41-60 days before registration) to the sale date (20 days after registration), *373 he attempted to factor out that portion of the decline attributable to the general market decline that occurred during this period by dividing his Average Stock Price Index by the market index of the NASDAQ Composite Index to obtain an Average of Adjusted Index. [9] The results showed that Average of Adjusted Index of each company declined significantly for each company over a short period, but that the periods for such decline varied from company to company. Accordingly, he chose to rely on the figures for Centronics stock, which, according to his study had a market pressure discount of 32.2 percent in the 41-60-day period before registration, and then declined to 1.7 percent in the 21-40-day period before registration. From this he concluded that an appropriate allowance for market pressure for a block of Centronics' stock was 30 percent. To this he added an additional 10 percent discount for "distribution costs," which included underwriting commissions, costs of registration and other expenses. *374 Mr. Danzig's private placement analysis was considerably less complicated. It was based upon a sample taken by the SEC between January 1, 1966 and June 30, 1969, which showed that privately sold stock was priced at discounts of up to 40 percent from the price that could be obtained in a public distribution of the same securities. From this he concluded that a 40 percent discount was appropriately applied to a hypothetical private sale of Centronics stock in March 1974. While we find Mr. Danzig's study to be most innovative and interesting, we are not convinced that it accurately measures blockage in a case such as this where valuation is to be determined by means of a peculiar standard under section 83. Mr. Danzig's testimony makes it clear that he valued Robinson's "lettered" stock within the framework that public sale was prohibited without a registration statement meeting SEC requirements. [10] Whether this implies that he included in his 40 percent discount directly or indirectly an element for the restrictions on marketability due to the fact that it was "lettered" stock--which section 83 prohibits--we cannot determine. Moreover, the study does not, in our opinion, *375 adequately show the extent to which general decline of Centronics stock for reasons unrelated to the secondary distribution may have contributed to the downward "pressure" experienced in the months before the secondary distribution. While he clearly recognized the problem and attempted to factor out other causes which contributed to the decline in price by dividing his index by the broad over-the-counter index, it has not been shown that Centronics stock had been following such index or, if it had, that it would have continued to do so during the period studied absent a secondary distribution. [11] Consequently, while the evidence does show a decline in the average of bid and asked prices of Centronics stock before the February 1974 secondary distribution (at which time investors presumably knew the material terms of that distribution), we do not know what portion of that drop was due to the market's concern with blockage and what portion was concerned with other factors. [12] In addition, the market pressure discounts calculated in the study for the other comparable companies indicate internally inconsistent results. There is insufficient correlation between the percentage of outstanding *376 shares, trading volume and the market pressure changes occurring from one period to the next. [13] There also is no explanation as to why the market pressure changes occurred during different pre-registration periods for each company. Finally, much of the information used in his report was not available until after the valuation date. Accordingly, we have serious reservations about the validity of Mr. Danzig's conclusions, although we do agree with certain of his hypotheses. *377 Centronics' expert, Selig Ratchick, testified that Robinson's 153,000 shares of Centronics stock could have been absorbed in the over-the-counter market within a 1-month period without depressing the market price of Centronics stock. He noted that Centronics stock qualified as "OTC margin stock," which meant that a purchaser would have been able to acquire the stock by borrowing up to 50 percent of the purchase price. He also felt that there was a considerable demand for Centronics stock, as evidenced by the fact that the February 1974 secondary offering was "quickly over-subscribed." He further based his conclusion on the fact that for 3 months after the February 14 secondary offering Centronics stock prices did not fall below that offering price. His testimony demonstrates, however, that he did not have particularly extensive experience in handling transactions that were of the scope of the one before us.His testimony was largely conclusory and unconvincing. The fact is that Caesars World marketed its large blocks of Centronics stock in a private placement and a secondary offering at substantial discounts earlier that year. We infer from this that Caesars World and *378 its financial advisors concluded that these were the only ways the stock could be successfully marketed.Moreover, he did not convince the Court that an "active interest" in Centronics stock as evidenced by the Caesars World secondary offering is dispositive of this question, since an "active interest" can always be generated--for the right price. Nor do we find it significant that the price of Centronics stock remained steady after the secondary offering in view of the fact that it had fallen to almost half of its value a few months prior to the offering. Thus we attach little significance to his testimony. Respondent's expert, John A. Carter, was clearly instructed to value Robinson's shares as though they were already registered. He analyzed Robinson's block of shares in relation to the number of outstanding and freely trading shares of Centronics stock on March 4, 1974, as well as the company's trading volume on and around that date. He also considered the views expressed in publications concerning the perception of Centronics stock and compared Centronics' trading level with that of other similar companies. But most importantly, Mr. Carter examined the market reaction *379 to the two Caesars World sales of Centronics stock in January and February 1974. He indicated that the stock sold in the private placement on January 3, 1974 at a discount of 21.6 percent from the average bid and asked prices on that date. With respect to the secondary offering on February 14, 1974, Centronics stock sold to the public at an approximately 20 percent discount from the average bid and asked prices, of which 6 percent was to bring to market a large block of shares, 6.9 percent was attributable to underwriting discounts and commissions and 7.2 percent covered selling expenses and registration costs. Despite the clear interest in Centronics stock that the market demonstrated in the heavy trading volume that occurred in early 1974, Mr. Carter concluded that Robinson's block of 153,000 shares could only have been placed in a secondary offering or a private sale similar to those that were made by Caesars World in January and February 1974. Accordingly, based on the Caesars World discounts from prevailing over-the-counter prices, he concluded that a discount of 16.2 percent was appropriate if the shares were viewed as "previously registered," and a 22 percent discount was *380 called for if they were viewed as requiring registration. On brief, respondent contends that Mr. Carter's testimony was "redetermined" to the extent that any registration costs or other potential selling expenses were included in his recommended discount. Thus, respondent now urges that Robinson's stock should be valued at 6 percent below the average bid and asked prices of Centronics stock as traded on the over-the-counter market on March 4, 1974. Mr. Carter's approach does not suffer from the shortcomings of Mr. Danzig's "market pressure" approach, nor does it contain the conclusory generalities of Mr. Ratchick's testimony, which we found to be unconvincing. Moreover, he was correct in relying principally upon two reasonably contemporaneous transactions which demonstrate the discount experienced in marketing large blocks of Centronics stock. The problem with Mr. Carter's analysis is that he assumed, contrary to Mr. Danzig, that the only blockage discount in the Caesar's World secondary offering was represented by the difference between the actual offering price and the average bid and asked prices on the date on which the underwriters set the offering price. He failed *381 altogether to recognize that such average prices were already then depressed as a result of the initial announcement of the registered offering in the prior October, a fact convincingly established by Mr. Danzig. Our problem with Mr. Danzig's study was not with his general thesis that there was a striking drop in the stock price which resulted solely from the announcement of the offering; rather, he did not satisfy us that he had adequately factored out other circumstances which contributed to the decline in the price between the applicable dates. We are satisfied that, if Robinson's shares had been marketed other than through a private sale, the assistance of one or more brokers would have been essential. Whether or not marketed formally in a secondary distribution, the market would have become aware of the existence of the large block overhanging the normal over-the-counter transactions. Thus an artifical decline in the over-the-counter price such as that described by Mr. Danzig would have resulted. On the basis of the experts' testimony and all of the other evidence before us, we are satisfied that Robinson could not have sold his stock within a reasonable period *382 of time at over-the-counter prevailing prices. Experts for both Robinson and respondent in this proceeding testified clearly to this effect. [14] The only logical inference to be drawn therefrom is that a blockage discount would have been experienced by Robinson if his shares had been marketed on March 4, 1974. [15]
*383 We now must address the question of the appropriate blockage discount to apply to Robinson's shares. The two Caesars World transactions provide the best evidence in the record with which to answer this question. In the secondary distribution, Centronics stock sold for $17.75, which according to respondent's expert was approximately 6 percent less than the average bid and asked prices on the date of the distribution. [16] However, as discussed previously, we agree with the basic thesis of Robinson's expert that some portion of the dramatic decline in the price of Centronics stock in the 20 weeks prior to the distribution date was attributable to the fact that the impending sale was known to the public. This factor must be taken into account in the blockage determination. Moreover, any broker undertaking a secondary distribution of Robinson's shares as of March 4, 1974 clearly would have noted the infusion of 200,000 identical shares less than 3 weeks earlier, and another 200,000-share block sold in a private sale 6 weeks before that, all in a generally declining market. Human experience dictates that such a broker would have demanded and received a discount *384 substantially in excess of the Caesars World 6 percent before agreeing to another secondary distribution in such a short period of time. The record is not, however, sufficiently complete for us to arrive at a blockage discount on the basis of a hypothetical secondary distribution. To market Robinson's shares in a secondary distribution on March 4, planning would have begun in January 1974--prior to the Caesars World offering. Thus, the lead underwriter of the Caesars *385 World offering almost certainly would have found out about the Robinson proposed distribution by or before the effective date of the Caesars World distribution. Common sense would also dictate that the Robinson lead broker would have undertaken at least to coordinate his offering with that of Caesars World or perhaps even joined forces. [17] Two large groups of brokers could hardly have been put together without considerable overlap. We strongly suspect that two large blocks such as these could not have been offered for sale by competing brokers within a 3-week period without having a substantial impact upon each other. It is equally possible that, unless the two offerings were actually combined, coordination would have been impossible. But even if both parties were willing to combine the offerings, lead time to revise the registration statement and prospectus would have been required. There is simply no end to such speculation. An equally likely hypothesis is that any broker advising Robinson would have concluded that, because of these problems, a secondary offering was at best impracticable as of March 4, 1974. Unfortunately, the record is totally devoid of any evidence *386 as to solutions to these obvious problems. Of more significance, we have no evidence at all as to blockage discount in a Robinson offering coordinated with the Caesars World offering, although we do have a basis for determining blockage in a private sale. For this reason, we are confined to a consideration of blockage discount in the context of a private sale. We find this to be an entirely reasonable conclusion to this case since in our judgment and based upon the entire record we believe that a private sale would have been the most likely method of disposition of the Robinson shares on March 4, 1974. Accordingly, our blockage discount determination is based solely on a private sale hypothesis. When Caesars World sold 200,000 shares of Centronics stock in a private sale on January 3, 1974, the selling price was approximately 21 percent below the average bid and asked prices on or around that date. A Robinson private sale would have been materially different *387 from the Caesars World private sale in some respects, however. On the one hand, the successful distribution of the Caesars World shares was a positive factor indicating that a discount of less than 21 percent would have been appropriate. Moreover, some of the discount experienced by Caesars World may have been due to the fact that a registration statement had been filed on October 31, 1973. It thus was known generally that a substantial block of Centronics stock was available for purchase, which may have given the purchaser a means of exerting downward pressure on the price. There is no evidence that there was any substantial block of stock available in addition to Robinson's 153,000 shares on March 4, 1974, nor, of course, was any registration filed for the offering of Robinson's shares. On the other hand, it is likely that in attempting to sell his shares privately, Robinson would have faced the contention of either the buyer or the broker that the previous Caesars World transactions had supplied the current demand for the stock and made Robinson's shares more difficult to market and, consequently, worth less, particularly in a falling market. We also note that the *388 Caesars World private sale was made to a supplier of Centronics; while there is no actual evidence that this was anything other than an arm's-length transaction, we cannot ignore business realities. There probably would have been no business incentive to induce a totally unrelated purchaser to give Robinson a favorable discount. Ignoring as we must the effect which the SEC restriction unquestionably would have had on the actual fair market value of the Robinson shares, but basing our opinion upon the entire record and exercising our best judgment on a highly theoretical factual question, we conclude that a blockage discount of not less than 18 percent should be used in valuing Robinson's stock. The fair market value of the 153,000 shares of Centronics stock acquired by Robinson by the exercise of his option on March 4, 1974 was $16.50 [18] per share. Accordingly, Robinson was required by section 83(a) to report $2,422,499 [19] as income in 1974. Correspondingly, Centronics was entitled to a deduction of the same amount under section 83(h) in its fiscal year ending June 30, 1974. [20]
*389 Decision will be entered under Rule 155 in docket No. 18038-80.
An appropriate order will be entered in docket No. 2951-82.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The underwriting discounts and commissions of $1.30 were approximately 7.3 percent of the gross offering price. This is a typical amount in the industry for such discounts and commissions. ↩
3. The estimated selling expenses were unusually high--7.2 percent of gross offering price--because they included registration costs. Without registration costs, these expenses would have been 3 to 4 percent of the gross offering price. ↩
4. The expert who prepared these figures did not explain why he used the bid and asked prices on February 12, 1974 to compare with the shares offered on February 14, 1974. We assume that this is because the offering price is agreed upon a short time prior to the offering.↩
5. Robinson contends in his brief that, because respondent at trial asserted a fair market value for Robinson's stock that was less than that asserted in the notice of deficiency, there is no presumption of correctness and, consequently, respondent bears the burden of proof. The law is clearly to the contrary. Silverman v. Commissioner,538 F.2d 927, 930↩ (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Moreover, our holding does not turn upon burden of proof, since we base our conclusion not upon one party's ability or failure to prove his case but upon our own analysis of all the expert testimony and other evidence presented.
6. We note that the parties and the cases generally have used the words "average" and "mean" interchangeably. Since there is no evidence in the record concerning the "mean" of the bid and asked prices of Centronics stock, we will use the "average" here.↩
7. See Steinberg v. Commissioner,T.C. Memo. 1983-534↩.
8. We note in this regard that one of the regulations under section 83 dealing with valuation of nonqualified stock options refers to the rules of valuation set forth in the estate tax regulations. Sec. 1.83-7(b)(1), Income Tax Regs.↩ (citing sec. 20.2031-2, Estate Tax Regs.).
9. After trial, we received an exhibit using the Standard & Poor's Office Business Equipment Index instead of the NASDAQ Composite Index to attempt to factor out market decline. While by our computation the results are similar, we are not satisfied that the exhibit resolved our problems discussed in the text.↩
10. For example, at trial he agreed that in his secondary offering study he was valuing shares that were registerable, but not yet registered until the time they were offered. In the private placement portion of his study, he valued unregistered shares. He also frankly agreed that his report did not have any data concerning the impact on the market of introducing 153,000 more shares that were already registered. ↩
11. Mr. Danzig did not, for example, study the performance of stocks of companies comparable to Centronics which did not have secondary offerings to factor out unrelated decline. ↩
12. We note Mr. Danzig's recognition of this problem at trial, when he guessed that "the market pressure effect must be more pronounced in a fallen [sic] market than a rising market." He also admitted that the market was falling in early 1974. ↩
13. For example, one of the comparable companies, Measurex Corp., had a secondary offering of 2,800 shares, which constituted 0.1 percent of its outstanding shares. Its trading volume was between 100,000 and 200,000 shares during each period prior to and during registration and jumped to 500,900 in the 20 days following registration. Despite the apparently insignificant number of shares, the market pressure declined from 25.2 in the period 1-20 days before registration to 6.2 in the registration period. Since Mr. Danzig indicated that there were no other extraneous factors exerting pressure on the stock indices of his chosen companies, he apparently would advocate a discount of 19 percent for the blockage generated by these 2,800 shares, an obviously absurd result.↩
14. We note a contrary conclusion reached in Estate of Van Horne v. Commissioner,78 T.C. 728, 741 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), cert. denied 104 S. Ct. 2364↩ (1984), relied upon by Centronics. There, however, the taxpayer failed to convince the court that it could not have sold its shares without a discount within a reasonable period of time. Here, in contrast, we find the evidence persuasive that a discount would have been necessary.
15. Centronics contends in its brief that we should not allow any discount for blockage because the number of shares being valued is less than the total Centronics shares traded in a year. See Bankers Trust Co. v. United States,518 F.2d 1210 (Ct. Cl. 1975), cert. denied 424 U.S. 966 (1976). In setting forth this "one-year trading volume" test, however, the Court of Claims recognized that the blockage issue should be treated in terms of "whether the market could have absorbed the shares within a reasonable period of time." 518 F.2d at 1221-1222. Witnesses for both respondent and Robinson clearly indicated that Robinson's stock could not have been so absorbed. In Estate of Sawade v. Commissioner,T.C. Memo. 1984-626↩, this Court applied the one-year trading volume analysis to a case where, on the basis of prior stock sales, it was apparent that the block at issue could be sold without a discount, a clearly distinguishable situation. On the basis of the testimony and the special circumstances of the Caesars World sales immediately prior to the valuation date, we choose not to apply the "one-year trading volume" analysis here.
16. The ordinary costs of selling securities are not subtracted from trading prices in fixing fair market value, but it is not entirely clear whether the extra costs of a hypothetical secondary distribution should be deducted. See C. Lowndes, R. Kramer & J. McCord, Federal Estate and Gift Taxes, p. 533 (3rd ed. 1974). Respondent clearly has taken the position in the estate tax context in Rev. Rul. 83-30, 1983-1 C.B. 224↩, that they should not be deducted. We do not need to address this question here, however, since we conclude, as discussed in the text below, that on the record before us we must value Robinson's stock as if sold in a private sale, where underwriting costs would not have been incurred.
17. It would have been useful if one of the parties had called a representative of Blyth Eastman Dillon & Co., Inc., the lead underwriter in the Caesars World distribution, to testify in this proceeding, but no one did so.↩
18. $20.125 - 18% ($20.125) = $16.50. ↩
19. This figure was derived as follows: ↩
Fair market value per share
$ 16.50 Amount paid
- .667
15.833
Total number shares
X 153,000.00 Income under § 83(a)
$2,422,449.00 20. The year of Centronics' deduction was stipulated to by the parties, as discussed in one of our prior opinions. See Robinson v. Commissioner,82 T.C. 444, 445↩ n. 3 (1984).